Thank you. If it pleases the Court, my name is Joel Dickter on behalf of the defendants. In this case, this is a review of a summary judgment granted by Judge Alsop and an action brought by the FTC. As such, this Court's review is de novo. This case is a bit different than many FTC cases. Most FTC cases involve a deceptive product or service or something to that. That is not the issue in this case. In this case, the Commission takes exception with some telemarketing practices to sell various services by my client. But the claim is really not, in the judgment below, is not based on the telemarketing. Nor is there exception taken with the actual services provided by the client, which I believe are valuable and there was evidence before the Court below were valuable services to the business customers. And this is primarily business customers, not residential customers. The issue here is a billing issue. The Commission is saying that here we billed through the telephone company, which is a different system. It's not a credit card bill kind of case. This is the telephone company places the charges on the customer's normal telephone bill on behalf of a third party. There are several intermediaries along the way. Our client takes an order for service. He passes it on to a clearinghouse, a middleman. The middleman scrubs that data, takes out calls that it doesn't believe are billable, don't meet certain criteria, puts it in a certain format, and then passes it on to the phone company. The phone company then does the same thing. It reviews it, puts it in its own format, and it also looks to the FCC's truth in billing regulations, which say how those third party charges are to be displayed on the telephone bill. Then it finally makes it to the customer's telephone bill. It's on a separate bill page. It's not mixed in with the normal. One of a hundred or what? It depends. You need a Ph.D. these days to read a telephone bill. You're right. There are all kinds of federal add-ons and charges and universal service funds and whatnot. But it is on a separate bill page with an explicit disclosure required by the FCC that says these are third party charges. You're right to question them. You will not lose your telephone service if you don't pay these charges. It's all explicitly stated there. So you can't take exception with my client in the way it appears on the phone bill. They also, on that phone bill, on the charge itself, gives an 800 number to call my clients or the defendants for customer service if you have questions about it. There's on that bill page for the company the middleman, the clearinghouse. You can call them with questions. You can also call the phone company with questions. And all of them have the ability to and can give credits or refunds related to that charge. That happens. It happens over time. These are monthly services. So someone will drop that over time. One of the services is to help small businesses build a website and market those websites on Google. Businesses at some point after a few months might say, I'd rather do this myself and control it myself now that I can see what it's going to do, and drop the service. It doesn't mean my client did anything wrong. I thought there was a finding that essentially these tapes, the recorded calls with the clients were doctored and that there were misrepresentations regarding the products and so forth. I mean, I thought it wasn't really before us. It was the core of the case wasn't before us, the fraud. It's what the judge, Judge Alsup, I think, did in sort of getting to his conclusions. Isn't that right? But that, yes, but that isn't what the cause of action is under the FTC complaint. Yes, there are these factors. Yes, there was allegations that telemarketing houses spliced things, but there was also evidence that that was done early on, and then corrections were made by my client to take away from those telemarketing companies, put it to other ones with third-party verification by a different party to review those sales to make sure they were legitimate. That first part then they did try to offer refunds to customers who were wrongly signed up in the first part. Judge Alsup, although, cherry-picked the evidence, I believe. He looked at one employee of the company, Mr. Nelson, and gave much credit to his testimony while ignoring the affidavits from other employees and the deposition transcripts of other employees saying that contradicting what he had said. So they also relied on the survey that was done, the analysis, which said that some 90 percent or some high percentage of the customers had no idea that they had even signed up for this service or they were surprised to find out it was on the telephone bill. That's correct. There was a study by Mr. Marylander, who does lots of studies and is very good, but he still has to work with what he's given. And that study both, I believe, has been misinterpreted by the court below and misstated. It asked people if they had signed up for Internet service. But that named the actual product, right? You just said something that's not right. You said service. It's services. There's an S at the end of it. That's correct. But it also said it did not define what Internet services means. No, but it gave the name, as Judge Akuta said. But it asked the question if, did you sign up for Internet services with blank company? It didn't ask if did you do business with blank company. It asked did you sign up for Internet services with blank company. The answer is no. Did you, through the, did your client or through your calls of their customer list find, adduce evidence about the satisfied customers, the customers who had signed up for this service and were satisfied with it? Was there any proper of that sort of evidence? There was proper. One example I'll give you. This was a two-headed monster, this case. First, the U.S. Attorney's Office brought a civil forfeiture case in a separate action and had a seizure in that case. In that case, it seized the computers of the client and the defendants were unable to provide the services. There is evidence below that there were numerous calls that came in to customer service and said, I can't access my service. Why couldn't they access service? Because the government had taken the equipment. It shows that there are people who are using and utilizing this service. We would have liked to have done more, but we were hamstringed in this case below. So there was no evidence present. Were there affidavits or declarations of the customers who had, who were knowledgeable, got the service, were satisfied with it? I know you had some evidence of people asking for refunds, but that doesn't seem like the same thing. There were a few. We would have liked to have done more, but we didn't have the money to do more. Remember, there was a certain – Were there affidavits to that effect in the record? Yes. That we would have wanted to do more. There's plenty of evidence in the record that we wanted – No, no. Of the satisfied customers. I'm just trying to understand that part of the case. There are a few. There are testimony from the customer service people of the company has satisfied customers. There are – there were some, a few affidavits. There was not a broad brush study or analysis done because certainly we would have liked to have done that if the court had provided the attorney's fees below to be able to do so. Same thing in response to the expert study that the court primarily relied on before. We were given no money to hire our own expert to undertake such a thing. Well, you had this declaration of John Wynn. Yes. And I think it's in your briefing. You say that shows the 70 percent of those surveyed in the Marylander survey got refunds. I looked through his declaration. I looked at the exhibits, and I'm totally lost in trying to figure that out. In that declaration, it doesn't reference specifically the 70 percent. It says he reviewed the affidavits of consumers who presented declarations to the FTC that said that they didn't sign up for the service and didn't know about the service. And he says he reviewed those, put them to their records, and that those people had called to cancel the service. He didn't put the exact 70 percent. We did that later on. Okay. Where does that come from then? It's in here. The 70 percent comes in from our motion for re-argument on the summary judgment below. At that point, we put in more evidence, another declaration from Mr. Lynn, attaching records. That's what I'm talking about, though. That's where I'm trying to find the 70 percent. For the life of me, I can't find it. I will have to look while the other side is talking. I'll be happy to look and find it. I don't know it particularly right offhand. It seems to me at best that's a conclusory statement not supported by evidence, from what I can see at least. No, it is in the record below, and I will provide you a cite for it. I don't want to spend my whole time on that issue. I want to get to the issue of the manner in which the court handled the redress and refunds in here as well. Go ahead. Therein, initially, Judge Alsop, in accordance with our --. It's Alsop. Sorry. My apologies. Had ordered a notice and refund procedure typically used in these kind of cases where a mailing is made to customers, all the customers, saying you may be eligible for a refund, similar to class action cases, CC cases saying please fill out the form and send it back, and you'll be put in the pool and the funds will be divided up. That's how it was initially done. Then the FTC filed a motion to modify, saying we really can't do it that way. We don't have the data to do it that way. And Judge Alsop, in his opinion in October, said I thought you said you could. If you can't, then we'll go. I'll be inclined to go to the pro rata, submit more briefs on that, where everybody just gets money unilaterally without having to make a claim or request for it. Then the briefs were submitted, the commission submitted a proposed redress plan, which was finally adopted, and that's the January filing order, where he adopts the FTC's plans for doing a pro rata, just mailing of people. If they don't pay, they'll do another round, and then ultimately any money left over will be given to the U.S. Treasury. That procedure we do not believe is equitable to consumers. In accord with the statutory obligations here under 13b, which was even used by the court below, it certainly had odds with 19b of the FTC Act, which does not provide for any kind of punitive or civil penalty action, and also violates what was done in the Second Circuit in Verity, which is another telephone billing case where the court said it's limited since 13b is limited to, it says the court may issue a permanent injunction, that it's limited to equitable remedies. And equitable restitution means the amount of gain by the defendants, not the amount paid. But haven't we said disgorgement is perfectly appropriate under 13b? It's the disgorgement of the improper gain to the defendants. Here what the court below did was the entire amount paid by the consumers and ignored the fact that has a Second Circuit call that there is a cascading payment plan here. First, Verizon takes in the money or another one of the phone companies takes in the money. They take out their piece. They pass it on to the clearing house. They take out their piece. Both of them take reserves along the way and hold money against that, and then they pass it on to our client. In Verity, the court said you have to recognize that those other parties have their own piece. You can only hold the defendants liable for the piece that they got. That was not done by the court below. Another problem that was done with the court below is in this system, it's not an exact system. The phone company doesn't report to anyone who paid their bills. The way the telephone company billing platform is set up, they only say we got an X pool of funds in from all the people who were billed, and we're going to hold some back, deduct our charges, and pass it on to the clearing house. And then they pass it on. They do then, through that reserve and future billing payments, say, oh, we got a request for credit from this specific customer. So here's the detail on that specific customer. But they don't identify, again, who paid. We don't know who paid. It could be 18 months, two years before they come back and say we're deducting money because this person didn't pay, and they may not ever tell you who paid. So now we have a class that's supposedly entitled to a refund, but we don't know the details of which ones paid, how much they paid. Did they already get a credit from the phone company? Did they already get a credit from my clients? Did they already get a credit from the middleman? Did they get a partial credit? None of that is known. That's why, in this instance, the only way to fairly allocate the funds is to determine who is entitled to funds by asking the consumer. In the Figge case before this Court ---- What if you can't do that, though? What if that's not possible? Where does that leave a court, just without any remedy at all? But that is possible. We know the list of customers. We know their addresses. We can do a mailing. It's been done before in another case involving a telephone building before this circuit. It was in Seattle's cyberspace case, which is referenced in our papers. That was exactly what was done. A mailing was done, requesting your entitled refund, getting it back, and determining how much ---- if the pool of funds is sufficient to pay them all, or if there needs to be a pro rata, or what happens there. I'd like to reserve my time. You can. Thank you. Good morning. David Seradsky on behalf of the FBI. Stand over by the mic if you don't mind. Sure. Thank you. May it please the Court. There really is no dispute about what happened in this case. The defendants caused charges to be put on people's phone bills that people did not authorize, charged them for services that they didn't agree to buy. The defendants conceded that. They conceded it by bringing suit against their telemarketers. And then, as Judge Alsop said, they wouldn't have given refunds to these customers except that the FTC brought this case. They would have continued charging these people. So that's not even in dispute. Or if you ---- so as Judge Alsop said, there are mountains of undisputed evidence showing fraud at every step. And the quibbles that they're bringing are like disagreeing over the size of the iceberg while ignoring the monumental fact that the Titanic sank. That's what they're doing here. There's certainly no abuse of discretion in picking the remedy. So just to touch ---- Kennedy, could you spend some time on the remedy? Sure. Because I do note that the ---- I think in Niovi, we went to the approved of disgorgement, but it was measured by the defendant's revenues. In this case, it's not measured by that, but by what the customer has paid. And I'm just trying to understand how that works. Right. Given the problems that counsel identified, identifying who is going to get what, I guess there's a blanket amount that's going to be divided, or how is it going to work? No, it's actually going to be based on the amount that people did pay, and we do have records on that. But let me turn to the legal question first, or rather an equity question. The issue is, does equity allow a restitution remedy, or are we stuck with a disgorgement remedy? And the history of the equitable jurisprudence and history in this circuit in particular over and over again has said it's perfectly permissible for a district court to use its discretion to require that consumers be made whole, even if that's more than the defendants received. That goes back to the Figge case back in the 90s, 1993, I believe, where there was a distributor in the way who was marking up the price, and the judge said, nonetheless, we're going to require disgorgement of all of it, because these defendants engaged in the deceptive practice. They're the ones who caused the consumer loss. Equity's job is to restore the consumers to their status quo. So if you go with the theory that the defendants are proposing, it's sort of like saying we're going to require the consumers to pay the cost of these billing aggregators to pay the cost of the phone companies for billing them. So they're saying, well, as the Second Circuit put it, they're saying, well, we'll pay restitution, but we're going to deduct the cost of the gun. It's like the classic joke about the patricide who throws himself on the mercy of the court because he's an orphan. It makes no sense for the consumers to bear the burden of paying for the phone bills, for paying the costs of putting these charges on their bills that they didn't authorize. And case after case, this Court, and really every other court, has said there's no right to deduct to deduct expenses that the defendants incurred in perpetrating their scheme. Most recently, there have been, I believe, four cases just in the last couple of years. There was this Defanchik case where there was a fraudulent marketing process, and he said, I'm only getting 11 to 20 percent, 23 percent in royalties. I've got this other company that is carrying it out for me, and it's my program, but I've got somebody else who's the distributor. The Court said, we don't care about how you're arranging for this. You're the one who caused consumers harm. You're the one who's responsible for making it up to consumers. Now, with all of that, it's really a moot point, because we don't think there's more than about $8 million out there to provide restitution to the consumers. And the judge found, with, again, mountains of evidence, that consumers were harmed to the extent of $38 million. So we're talking about 20 cents on the dollar at best, assuming that we're able to recover the money that's still out there. Most of it's already been recovered. So we're talking about 20 cents on the dollar. There's not going to be a bonanza to the government, because there's not going to be any money left over at the end. And, in fact, the reason that the pro rata distribution system makes sense is because in the circumstances of this case, where you don't have enough money to give out, you want to take the money you've got and distribute it in a proportional way to the people who are out there. If you rely on people making claims, again, it's sort of like their whole business model. We're going to keep charging you until you come in and beg for a refund. And even then, we're going to make it difficult for you to get the money back. So that's the kind of remedy that the commission wanted to avoid and the judge agreed was inappropriate, which is to say, well, you have to come in with a claim, sign on penalty of perjury for money that maybe you don't even know that you've been – that's been taken from you. Remember that something like 97 percent of people didn't even know about these charges. We're talking about small businesses. They get phone bills that might be hundreds of pages long. Maybe every month they're not going to notice that there's an extra page that has an extra $30 charge that they don't know anything about. So you're going to make these people, who might not even be saving their phone bills, come in and make a statement under penalty of perjury. The FTC said, under these circumstances, that doesn't make sense. And the judge agreed. And the standard for reviewing that is an abuse of discretion. So in order to show that Judge Alsop committed abuse of discretion, you'd have to say that what he did was illogical or implausible or not supported by any inference from any facts in the record. That's the Hinkson standard for abuse of discretion. They certainly haven't satisfied that standard. Okay. So that's the remedy issue. I can turn back to the issue of their liability. The best evidence that we've got is the evidence that Judge Alsop himself required at the time of issuing the temporary restraining order. He said to these guys, send out postcards to all the customers that you know about and let them know that the phone company billing system is going to be shut down. So if they want to continue receiving their service, please return a postcard. They sent out something like 10,000 postcards, and guess how many came back? Thirty-six. So, yes, there is evidence that there was – that there were satisfied customers, 36 of them. And those 36 customers, the – those customers won't be receiving refunds, and the money that came in from those customers was subtracted from the total amount. We have evidence that there were another 20 customers, 20, again, out of 10,000 or so who were receiving bills, who called in to update their websites. Now, we don't know how much overlap there is between the 20 and the 36, but fine, we'll deduct those 20 also. So out of 10,000 customers, we've got evidence that 56 really wanted these services or called in and used the services. But there's tremendous evidence that most of the customers had no idea they were being billed. You've got the survey evidence. Again, it's an abusive discretion standard about whether the judge admitted that testimony, the extent of credibility that he accorded to it. You've got lots of testimony from people who worked for Inc. 21. There's just a tremendous record here supporting this. And, you know, Judge Alsop looked at this and said whatever quibbles that the defendants have raised are peripheral facts, and they compare to sweeping themes established by the FTC. Really, on summary judgment, it's true that the standard is de novo, but when the plaintiff comes in with a record like this, the burden shifts to the defendant to refute it. And the defendants came in with nothing. There were no satisfied customers who came in and testified. What about their claim they had no money to really defend the case? What do you say to that? It's really not our responsibility as the FTC to pay for their defense, and it's certainly not something that we should be charging out of the fund that's being kept to restore to the defendants. I mean, it's their – there's no Sixth Amendment right to counsel going on here. Somehow they can go out and get the money. Now, there was some money that was disbursed to them to pay for their legal defense, which arguably we could have challenged. And, in fact, this Court in the Network Services Depot case clawed back money that had been paid out to counsel because the counsel should have investigated and known that it was fraudulent proceeds. So it's not our problem. In fact, they noticed the deposition of the survey expert, and the expert came out and our counsel came out, spent a lot of time and money preparing for this deposition, and they canceled it at the last minute. So that's imposing a cost that was unnecessary. But it doesn't matter. It's their responsibility to defend themselves, and it's their responsibility to refute the summary judgment. And the judge did not make a clear error in finding that they failed to do that. So thank you very much. Thank you. You have a – I'll give you a couple of minutes for rebuttal. Thank you, Your Honor. The 70 percent comes from excerpt page 172, which was an attachment to Mr. Lynn's July declaration. And it shows on there the list of names of the consumers they were able to identify. We didn't get full information from the FTC to identify all of them. The ones we were able to identify, how much money they were charged and how much money we are aware of they got credited back. In some instances, as I was saying before, they actually got credited back more than they actually paid because they didn't get money from different sources. In that vein, I would want – I would think you'd want to make sure if there are a Instead of just saying, I'm going to give this one X dollars and that one X dollars without them having attesting to the fact that they are the right people. And also, there's another thing that I've just learned about. I'm not exactly sure how to present this, but there's a case pending in the northern district, a class action suit against Verizon challenging all their billing on behalf of third parties and asking that refunds be made across the board to all Verizon's customers. And there's a pending settlement in that case, Moore versus Verizon, that would require distributions in that case. So now we're going to have mailings, checks done and mailed in this case. They're going to be sending out claims forms or mailings and checks in another case. It's – the way this system works, it just – really, you're never going to get the money to the right people. The only way to do it is to say, yes, I didn't want these services. I didn't mean this. I am for service. Yes, I was charged. And you're going to tell them on this mailing that I – according to our records, you paid $120. Do you want that money back? Do you believe you're entitled to that money back? And yes. And there's nothing wrong with them saying on the penalty of perjury that, yeah, I think I'm entitled to the money back. I didn't mean to sign up for the services. There's nothing – there's no harm to them from that. Okay. Thank you very much.  Thank you, counsel. We appreciate the argument. And we will stand in adjournment or recess. Whatever we're doing. Last day in any of it.
judges: Seabright, Fisher, Ikuta